Thank you, your honors. It's good to see you again. Again, my name is Ethan Ballo. I represent Alejandro Mujica, and this morning I will be speaking on behalf of all appellants, including Jose Murillo and Oscar Rodriguez. This case occurred at Victorville Prison. Five days after being involved in a prison brawl, Peter Scapazzi went brain dead in a hospital, Arrowhead Hospital. He was removed from life support, and he died. This brain death was not the result of the wounds he received in the brawl. Rather, the day after Mr. Scapazzi was brought to an intervening hospital at Victor Valley, he received medical treatment, and when he was left alone, he pulled a breathing tube out of his mouth. This was an unforeseeable, irrational, we would suggest deranged act. When Mr. Scapazzi pulled the breathing tube out of his mouth, he had a sudden loss of blood, leading to a cardiac arrest. His heart stopped for 12 full minutes before he was resuscitated. The medical staff at Victor Valley realized he needed further treatment. They medevaced him to Arrowhead Hospital, where he suffered another cardiac arrest. His brain swelled during this time because of the loss of blood. When his brain swelled without any relief from the brain, the edema of his brain broke, and that caused brain death. The doctors ordered him removed from life support, and he expired. This is what caused his death. It was etiologically unrelated to the puncture wounds in his chest. But the jury that determined that these appellants were the proximate cause of his death, as required to find that beyond a reasonable doubt, were never apprised of these facts. And they weren't apprised of it because the district judge excluded the evidence at the government's request. And this was error. The government agrees that they were required to prove beyond a reasonable doubt that these appellants, and the only person that stabbed Mr. Scapazzi was Jose Murillo, that Mr. Murillo was the proximate cause of his death. And this case, we say, is controlled by a case called United States v. Maine. The panel was Noonan Thompson and Kleinfeld, highly respected judges of this court. And they say that the cause of death, proximate cause, is a fact question for a jury. They found it's a fact question a jury is peculiarly qualified to answer. And we contend and appeal that the district court's exclusion of the evidence of Scapazzi's irrational response to treatment was something the jury had to consider. We know that Mr. Scapazzi fought with the first responders. We know he pulled out his breathing tube. We know that he had the cardiac arrest that led to the swelling. We also knew that prior to the time that Scapazzi took these acts, the wounds that he had received from Mr. Murillo were healing. They had been treated, and they were not the cause of any blood loss. They were not the cause of any brain swelling. No, actually, it was not contradicted at all, Your Honor. And I thank you for that point. What Dr. Holt, who was a medical examiner, testified to was that he died, Mr. Scapazzi died, from a sequelae of puncture wounds to the torso. And that's the exact point we make. You would think, oh, that means he died from the puncture wounds. But sequelae means secondary results. And as was proffered by the defense counsel, and as was blocked on cross-examination, when Mr. and the medical, excuse me, as far as the medical record, he definitely died from brain death, and these are true facts. I don't think my opponent will dispute them. When on cross-examination, they said, Dr. Holt, you said sequelae to the torso. You said complications. Can you please tell the jury what you mean by that? The judge blocked the inquiry at the government's request. Well, Dr. Holt, when you said complications, don't you mean he died from brain death? Objection. No grounds. Objection. Sustained. Move on, counsel. And this is ER 19-22, or ER 18-22. So, counsel, what case authority should we look to, if we were writing an opinion, that would support your argument? What case would support our ruling that if there is medical negligence following a gunshot wound or a stab wound, that medical negligence relieves the perpetrator of criminal liability? Point us to the case that we would cite. I'm going to give you three questions, three cases, Your Honor, but I may kind of respectfully change the focus of your question. I don't want to give you three cases that say medical negligence is enough because I don't have those cases. So I'm going to give you the cases that say proximate cause is a fact question, and here's why, and the cases that say we were entitled to introduce this evidence that we were not the proximate cause, because there was an intervening cause. The standard is... The question I'm posing is if there, because that's the scenario that you're painting for us, is that it's the complications that arose in the medical setting were the cause of death as opposed to the stab. So I'm asking you to give us a case that we could cite. If we were to write an opinion that would support, not the general proposition of proximate cause, because... Because Maine is the example where the gentleman is driving a car, and they get stopped by some tribal police, and when they go to arrest the driver, his passenger jumps in the driver's seat with the other passenger, and they take off. And he has an accident, and the passenger gets pinned, and the passenger dies from asphyxiation. And the question in that case was should the jury have been allowed to consider whether the driver was the cause of death? And the district judge said no, and Judge Noonan, Kleinfeld, and Thompson said no, no, no, of course the jury. It's a jury decision. And they gave an example. They said, and the standard they said is was the cause of death reasonably foreseeable? Were the downstream events reasonably foreseeable? In this case, they said maybe it was. It could have been that he would have an accident if he drove twice the legal limit, if he had a blood alcohol three times the legal limit. A jury could find it, absolutely. But this jury wasn't permitted to find that element, so that's error that requires reversal, because the district judge took it away by not instructing him. The judge let the evidence in, but didn't let them instruct him. And maybe it was a bear. If a bear came in, would that be enough? Do you agree, though, that your argument would only apply to the murder convictions and not to the conspiracy? No, I don't, but can I just give her two more cases, Your Honor, before I answer your question? The second case I'd give you is the Brackett case out of the Seventh Circuit, which addressed a very similar case, situation on a sufficiency Jackson challenge. We talked about Jackson on Monday. And what happened in Brackett is a man, a young teen, or a young man in his 20s, a raped and beaten elderly woman, who was afterwards treated. She went to a nursing home, and weeks later, she was in a debilitated state. Because of the injuries she suffered, she couldn't eat. When a nurse was feeding her, food lodged in her trachea, and she died from asphyxiation. And then the Seventh Circuit said a jury could find that that was reasonably foreseeable, but only because the jury heard all the evidence. And the jury was able to consider, was that downstream event of treatment and injury to the neck and asphyxiation, was that reasonably foreseeable? But the evidence came in. So I'd give you Brackett. And the third case I'd give you is Stiver, which talks about, and even built on Evans yesterday. And I know Judge Gould had objected to the quality of the evidence that was excluded in Evans and now reversed. But the standard is the same, and the standard is, if a district court excludes evidence that's critical to an element the government must prove, that's constitutional error. But back to your question. Is that S-T-E-V-E-R? Yes, Your Honor. That's the Mexican TDO case. It's a Judge Berzon opinion that's been built on since then, including Evans yesterday. Okay. The question that you had, Judge Lamel, no, I disagree that it doesn't relate to the conspiracy case. And I think we laid it out a bit in our brief. The death was the key to the conviction on both counts. And the government argued, remember, that there was not only a conspiracy to kill Scopazzi, there was a conspiracy to kill Ulch, and there was a conspiracy to kill Rondo. And the big delta in the arguments and the jury's finding was they only sustained the conspiracy to murder for the man who died. And though my client, and just to be clear, my client didn't argue self-defense because he didn't testify. His only defense, Mr. Mujica, was his cause of death defense. Granted, Murillo and Rodriguez argued self-defense, but they were debilitated from arguing the secondary defense. But on the conspiracy one, the jury made that distinction. And Mr. Raphael in Mr. Lokia's trial argued, well, no, they definitely intended to kill Ulch because they could have had his vital organs. They could have. They made the argument that the stab wounds were important to determine intent. And the jury rejected that. So by their split verdict, I think they made a difference, that death mattered. The limited injuries that we pointed out, they were all treatable. They were treated and healing. They didn't cause his death. We think that a jury, if they had this evidence, might have concluded that they didn't intend to. And the notion that the jury could have compartmentalized Scopazzi's death outside of the conspiracy to kill him, we think that's a bridge too far. Before saving what I can for rebuttal, I'd like to briefly address the Mexican Mafia evidence. Kennedy v. Lokia, this Court, the teaching is that gang evidence is almost always reversible error unless it's directly tied to the case. In this case, the government's theory was that when Scopazzi was drunk and called Murillo a bitch, that raised tensions. Our defense theory and defense testimony was no, when he opened his cell door and said I could have caught you slipping and then play fought, that rose tensions. But it was personal between Yogi, Mr. Murillo, and Big Dave. It wasn't about gangs. And so the evidence of the Mexican Mafia was sprinkled in to tie them to the Mexican Mafia. How do you explain the kite, talking about, you know, they represented well and? I think that's fantastic, Your Honor. I'll close on that. Okay. The kite comes after the government's theory. The government's theory says because of whether it's a bitch or the room, whatever, that before anyone goes into 204, this conspiracy is set. They talk about the meeting at the cell. And obviously the juror rejected it when they acquitted Menendez and who was the other juror? Martinez. So there was two full acquittals. But what the kite says, and we take the kite at face value, is the violence erupted when he said fuck you South Siders in the cell. Pardon my profanity. On the record. Not in our briefs. And that's when it erupted. And that is the same as, so it's after conspiracy. It's not part of their theory because it happens in the cell. And we would say it's the equivalent of any altercation if outside, you know, God forbid me and Tony had a thing. And I said, wait a minute, like, F you, you F and F, or, you know, I can't believe you convicted my guy. And I got on his grill and he responded to it. That's not gang related. In any case, it's irrelevant to the theory because the theory of the case is way before I came into that cell and met Tony, hours before I said that to him, that's when the beef happened. So what the kite proves that the conspiracy couldn't have happened beforehand, it's not consistent with their theory. It was irrelevant under their theory. And the last point I'd make is under their theory, even a low class serenio who has no connection to the Mexican Mafia, the Mexican Mafia evidence would come in because if you're a low status serenio, you want to become a high status serenio. You're in prison. And the best way to become a high status serenio is to murder someone, according to the government. So it just, it wipes out any basis for it. There's no distinction there. It's just guilt by association. I thank you for your time. I'd ask for a little bit of rebuttal. We'll give you a minute for rebuttal. Thank you, Counsel. All right. Good morning. Verna Weefald on behalf of Oscar Rodriguez. I would like to address the Brady issue regarding the Rule 35 motion that was filed by the government on behalf of the make or break witness, Ryan Davis. Ryan Davis is the only witness who supported the government's theory about, testified as to what happened inside of that cell. That it was not self-defense or a drunken prison fight, so to speak, but in fact that the defendants came in there armed and ready to kill.  Ryan Davis was, it was disclosed that there, Ryan Davis had not been given any promises in regard to his testimony. It was disclosed that he was an armed career criminal and he had gotten 10 years in his case in Oregon for which he cooperated, and that's why he got 10 years. But basically that was it. Ryan Davis was asked by criminal defense attorneys, the trial attorneys, over and over again, you are aware that the government could reduce your sentence afterwards. He said yes, but I don't know that that's going to happen in this case. I wasn't given any promises, and the government, this, Ryan Davis never, never conceded that he hoped that he would get any kind of a benefit or reduced sentence, as a result of his cooperation, and in fact he said and insisted that his motivation for coming forward out of great risk to his personal safety was that these guys killed Mr. Scopazzi, and that if no one cooperates, they'll get away with it, and that's why I'm here. But what in fact happened, oh, one more thing that's important. In closing argument, the government's rebuttal argument said, you know, there's been some suggestion that Ryan Davis is testifying because he's looking for a deal. But he testified, and there's no dispute that his release date is January 2001, and this is July of 2008 that that's being said. He has more than two years left to go. Repeatedly said he's getting out January 2011. The jury verdict came down on the 25th of July 2008, excuse me, yes, the 25th, and that very day, before the court is even completely recessed, the government calls up the Oregon prosecutors and begins the process of seeking a Rule 35 motion. It is filed for a time served sentence. It's granted, and Ryan Davis was released from custody on the 23rd of October 2008 before the defendants were even sentenced, and that was never disclosed. We learned for the first time that there was in fact a Rule 35 motion for a time served sentence in December of 2011 when we litigated the limited remand for the Rule 33. Now, why is that a Brady violation? I mean, we need to show that it's impeaching, we need to show that it was suppressed by the government, and we need to show that it's material. I don't think the government's going to dispute that it was impeaching. If the jury had heard that Ryan Davis was going to get a Rule 35 motion for a time served sentence after he testified, I think that that would be a very big deal. The government disputes that this was suppressed because it wasn't a promise. Well, all I can say is it walks like a duck, it talks like a duck, it's a duck. But the issue is, was it an undisclosed promise? For it to be Brady, there would have to be a promise that was made that was undisclosed. So what's the evidence in the record that a promise had been made that was undisclosed? Because that was thoroughly explored during cross-examination, right? Well, I think this is what I would say to that. It clearly was a tacit understanding between Ryan Davis and the prosecution. Because we have to, and there are numerous cases in this circuit regarding winking and nodding, failing to disclose, tacit deals. Let's look at this. We have Ryan Davis as a veteran informant. He has already cooperated. He insists, and in fact, even in his testimony he said, well, I got 10 years and I cooperated, but it sounds like he's just spilling the beans on himself. He goes, I don't know, the judge came up with the 10 years, and I got three points off for acceptance of responsibility. He's not really even conceding that, you know, getting deals and that kind of thing like that is the motivation for anybody to do anything as a criminal. We have the, he has a long-time lawyer, the snitch lawyer from Oregon who's talking, he said, well, the government didn't make any promises. The government doesn't have to make any promises. We know how this game is played, and there are numerous cases in this circuit where talk about these vague, undisclosed, you know, winking and nodding. We have Ryan Davis who's like, I can just picture this. We don't have to say, you know, the government, the FBI agents, the DEA agents are sitting down and saying, well, you know, we can't promise you anything. Oh, I know, I just want to see justice for Mr. Scapazzi. And, you know, we really can't promise you anything. Oh, I understand that. But then immediately, immediately after the jury has been told this guy's not testifying for a deal, immediately after he testifies that I'm here to seek justice, they move to get him out of prison, and he's out of prison two and a half years ahead of schedule, 20% reduction in the sentence, and before the defendants are even sentenced. What's going on here? The government may say subjectively that, you know, we're going to do this if this guy testifies in accordance with what he's told us before in debriefings with our agents. And then he testifies, is consistent with the debriefing, and then later they said, okay, we're going to go ahead and file a motion to reduce, or in our situations in the federal system, you know, rule 35. It seems to me as if you're attacking the very fact that they did with the deal that was disclosed authorize him to do. I disagree. And you're asking to get into subjective intent of the government. I know you say objective factors, but the timing of the rule 35, but I'm just wondering if that's really a subjective argument you're making. I disagree that this was part of the deal that was disclosed, and I'll tell you why. Because the prosecutor said in his rebuttal argument in response to the defense attorney's attempts to try to make it look like Ryan Davis was testifying for a deal, he specifically said that's not the case. They're trying to make it look like he's testifying for a deal. And it's not disputed, ladies and gentlemen, he's getting out in January of 2011. And then the prosecutor goes into, and in fact he came in here because he said if I don't cooperate, they're going to get away with it. So the jury is affirmatively misled about this man's motivation for testifying. And the Ninth Circuit, there are numerous cases starting. We have Will Hoyt v. Vasquez in which Judge Trott says in his concurring opinion, if we sanction these kinds of winking and nodding, these tacit understandings, or, you know, in that case where the prosecutor says to the defense attorney, like, don't worry about anything, just don't tell him anything, that kind of thing like that. And Judge Trott said, you know, our system of justice sanctions deals between prosecutors and defendants and so on. And he goes, on whom do we rely to keep the system honest? But we have, in that case there was concrete evidence that there was a secret agreement and also an agreement not to disclose the secret agreement. So we had concrete evidence in that case that there had been a tacit agreement to reduce the sentence. But we don't have anything like that here. But we do have, there is a Ninth Circuit case, Randolph v. the State of California, in which I've cited that in my brief, in which this court remanded it for a hearing because even though, again, no promises, the problem is that if you look at what happened to the informant's case afterwards, the government made numerous appearances on his behalf. I should say it was the State Attorney General made numerous appearances on his behalf. And, in fact, he did get all these benefits. We have, we also have Hayes v. Brown. We have ‑‑ But there are no numerous benefits in this particular case. It's just his sentence was reduced. I think that that's probably the most important benefit for this guy. This guy is a veteran informant. He is a drug addict and he can't wait to get out of prison. For any of these guys, I mean, the gold mine of benefits for informants like that is a time‑served sentence. Think about, and if it wasn't, let's look at it in reverse. If it's not a promise, if it's not a winking and nodding, if it's not a tacit understanding, if it's not a deal for this guy, why didn't the prosecution, they often have vague deals like this. This is very common in federal court. We can't promise anything, but we will tell the judge that you cooperated. And, you know, it's up to the judge to do what the judge wants to do with that. We're not going to, you know, make any deal saying you will get out or you won't get out, but we'll tell the judge that you cooperated. But that's when a sentencing is pending. That's not this case. That is correct. But it's still, because here, this guy is asked over and over again, they could move to reduce your sentence. So the jury's heard, well, they could do that, but then the prosecutor is denying that that's really going to happen, and this guy is motivated to testify because he wants to seek justice. How do you think the jury is going to ‑‑ what do you think you'll have a jury with a guy getting out? You've exceeded your time. So thank you very much. We understand your point. Thank you. We'll hear from the government. Thank you. May it please the court, good morning, your honors. Tony Rafael on behalf of the United States. The defendants in this case conspired to kill the victim, David Fischer. Jose Mourio stabbed the victim five times. Two of the stabbed ones. One was an 8 millimeter deep stabbed wound that punctured the victim's right lung. The other, another stabbed wound was 12 centimeter long that punctured the victim's right lobe of his liver, went back to his intestines. I'd like to go back, first I'd like to address the negligence, the medical negligence issue. And I think it's important to look and see what the defendant asked Judge Phillips to do, pretrial. And the pretrial motions in this case are attached at the GER 1823 to 1875. So the defendants in this case filed, the government filed a motion to exclude evidence of medical negligence. They also exclude their expert. And Judge Phillips issued a written order and that's at ER 51 and 52 and ER 59, the relevant portions. And I'd like, even though this is not very elegant, your honors, I want to take just a small minute to read what Judge Phillips wrote because it's very important. She said, the NICE circuit has not addressed the issue of intervening medical negligence as a defense to murder. Other circuits have confronted the question, however, and in general have held that intervening medical negligence is not a defense to the charge of murder. She cites to the Rodriguez case and a couple of the other cases, the Peters case and the Gillette case. The Rodriguez case is from the 11th circuit. She goes on to say, the 11th circuit has held that gross medical negligence, however, can be a defense to murder if such gross negligence is the sole cause of the victim's death, citing Rodriguez. Then she goes on to talk about what the defendants are asking for. So she talks about Jose Murillo had filed the main motion there or the opposition to the government joined by other parties. And Judge Phillips wrote, defendant Murillo seems to concede this is the correct standard with regard to sole cause of death. So they conceded that, that in order to be a defense to murder, whatever the negligence is, has to be the sole cause of death. And then she goes on to say that defendant Murillo, as he argues, that evidence of gross medical negligence is relevant to the cause of death and the issue of intent to kill. So they argued it's either relevant to cause of death or intent to kill in the beginning. Judge Phillips goes on to conclude that in this case, because the defendant, through their expert, Dr. Morgan, and Dr. Murillo, who was the chief of emergency medicine at UCLA, had not proffered any evidence that any intervening negligence, any negligence, any other acts, was the sole cause of death, she's not going to allow medical negligence to be introduced. However, she will allow Dr. Morgan to testify, and this is at page 59, ER 59, concerning the intent of the defendants, not specifically the intent, but let me read that. Doesn't your argument all go to whether or not, this whole issue goes to whether or not that's a fact question for the jury to decide, as opposed to a legal question? What standard do you use? And they can instruct the jury along the lines of what you just said, saying that you have to find gross negligence was a sole cause that led to the death in order to say that there was no liability for the murder. But it seems as if your opponent is arguing that that may be the correct standard, but that's an issue, a fact issue for the jury, not the judge. That's correct, Your Honor, but what the defendants did at trial, they didn't ask for that. They didn't proffer evidence. The only thing they asked for is to proffer evidence, and I'm going to read what happened at trial, I'm going to cite what happened at trial. So Judge Phillips allowed them to introduce evidence, Dr. Morgan's opinion, with regard to the wounds, the degree of force used to cause them, as such testimony is relevant to the intent of the defendants. They never did, so what did they tell Judge Phillips at trial? This is after the medical examiner had testified. They didn't go back to say, Your Honor, we want to introduce evidence of medical negligence because it's a defense to murder, it's foreseeability. We want to show that the only thing they said, and this is at a sidebar, and this is at GER starting at 737, 738, and this is Mr. Kline, one of the defense counsel for Mr. Murillo. He states, I wanted to do this earlier, and he goes on, the state of the evidence with this witness, talking about, I believe, the medical examiner, is that we have five puncture wounds that are nonfatal. Each one of them, and all of the jury knows, is that there is something happened and some complications after that resulted in the death of this person. And then he goes on, the jury is going to have to make a determination of the intent of whoever it is that stabbed Mr. Scapazzi, and they are now left with the impression that these puncture wounds are fatal, and they're not. Again, they only focused on the intent of the defendants. Judge Phillips had ruled, and she told them here, I'd already ruled on that. Bring your expert. Put in your expert, the chief of emergency medicine at UCLA. Let them testify about that. They never did. And the medical examiner in this case, his testimony was limited. He testified about the five puncture wounds, he testified about the organs that they hit, and he said that the victim died from secondary or sequela complications, or secondary complications. Of those injuries. The medical examiner never got into pulling the two... Doesn't that open the door then for impeachment and cross-examination? Then what do you mean, doctor, by these things? I mean, a juror out there, I imagine, may not know these medical terms, but doesn't it raise an unanswered question there, that perhaps the other side, just out of simple, fundamental fairness? Your Honor, again, there was no proffer from the defendants at trial that those, with those complications, or how is that going to be the sole cause of death that would cut off their liability? But you have a witness here that could explain that, who opened the door by saying that. Again, Your Honor... In my opinion, at least, perhaps. But I guess what I would say, respectfully, Your Honor, is that the witness did not open the door, and there's another part where, another sort of outside the jury discussion. I think this is, let me just make sure I have that. And this is at ER 448, and then there's another section, also, Your Honor, with another witness, the witness at GR 70A. The government, from the beginning, limited, told the court that it was going to limit its direct examination of the medical examiner. We're not going to get into all the details, how he was transferred, he became brain dead, they took him off life support, and we stuck to that. We never, all the medical examiner testified is that there were some complications from these stab wounds. There was no proffer, a sidebar, anywhere else, that, from the defense, that somehow there was an intervening cause that would cut off their liability. The only thing that they argued was, this is important to talk about the intent of the defendants. But they never said how it's going to be the intent. And the only thing they brought up with regard to intent pre-trial was the expert testimony of Dr. Morgan, and they never put that in their case in chief. They never put on any testimony with regard to the force that was used, or the type of force that was used, even though Judge Phillips had allowed him to do that. Was there evidence that the victim here actually removed the feeding tube? There was no evidence, Your Honor, but in the autopsy report, which was not introduced at trial, was not introduced through any testimony in the autopsy report. There was, he did remove his feeding tube, but again, Your Honor, I submit in this case. But that didn't come out at the trial? This did not come out at trial. Again, the only thing that came out at trial, he was stabbed, the depth of the injuries, the organs they hit, and that he died as a result of secondary complications. Well, was it because of the district court's ruling that that evidence didn't come out at trial? If the district court had allowed the evidence of medical negligence, then the feeding tube evidence would have come out at trial, most likely. That's correct, Your Honor. Again, but the defendant never argued that this was, that would have been a sole cause of death, as the district court had ruled, as it should be the standard, again, in its written order on ER 52 and 53. That's the position that the defendants took in their own papers. So your argument is that once the evidence came in, that the defense could have proffered what evidence they would have admitted and perhaps convinced the judge to rethink her position? Is that your? That's correct, Your Honor, because the defendants agreed that for medical negligence to come in, it had to be the sole cause of death. But they never came forward with any evidence, through their own expert or through what the medical examiner would say, that, hey, this witness is going to say that the medical negligence, or pulling out the tube, is the sole cause of death. As Judge LaMalle intimated, they could have said, the door's been opened now for us to put in other evidence about what the cause of death was, and so here's our evidence, and the district court judge could have admitted it or not, and we would have had a record as to what the evidence would have been. That's correct, Your Honor, but they only asked to admit evidence with regard to the intent. Not, they never argued, as of the final sidebar, where they're sort of summarizing the state of the evidence. They're saying, look, this is what the jury is left with, we don't have any evidence to talk about intent, and Judge Phillips responded, already ruled on that at the pretrial motion. And that's the reason, I mean, I can see as a practical matter why the defense wouldn't have kept insisting on that, because the district court judge had already said, this evidence cannot be used. It cannot be admitted, so the defense was in a little bit of a bad place, because you don't want to antagonize the judge by insisting on admitting evidence that the judge has already said can't come in. And two things, Your Honor, if I may. One, let's be clear, those stab wounds were, there's no evidence that they were not fatal. They punctured the victim's lung, they punctured his liver. Twelve centimeters going through his body, through his right lobe, into his liver, through his intestines, that came in. Puncturing the lungs, those are not small injuries. Those are not the kind of injuries you sort of, you know, it's not like scratching somebody's toes and the doctor gives them an infection, or the doctor infects them with some kind of a virus. Yeah, but the record reflects they were not immediately fatal. That's correct, Your Honor, but again, you know, again, he was bleeding internally, he was stabbed, he had a punctured lung, he had the liver was punctured, the right lobe. Again, no small injuries, and those are the injuries as the complications from those injuries. Counsel, Judge Gould, if I could ask you a question, please. Did the defendants ever proffer evidence to the court that the act of puncturing the right lobe was fatal? Or that the act of the decedent in trying to, in removing the tube in his mouth was a supervening cause of the death? Here's what they said, Your Honor, and I don't, it was never proffered as evidence. It was simply, they asked the district court, and let me find, this is at ER 448. Again, it's Mr. Kline, and here's what he's saying. These are the complications that flowed from the stabbing of Mr. Scapazzi that I would elicit from the coroner. Mr. Scapazzi was first taken to Victor Valley Hospital. In the course of his treatment there, he was put on a breathing tube. While he was there, he pulled the breathing tube out, and he also had a sudden loss of blood. The combination of pulling the breathing tube out and the sudden loss of blood caused a cardiac arrest. In other words, his heart stopped, and it stopped for 12 minutes. So that's a proffer. That's correct, Your Honor. But again, this proffer is also based on what the stab wounds caused in this case. Counsel, I'll let you know what's bothering me, and I'll let you address it. That's the normal medical negligence. Let's say there's stab wounds or bullet wounds from an assault, and then the doctor's hand, in surgery, there's a doctor whose hand slips. That's a routine medical negligence. I can see why that wouldn't be, or why courts might not want to get into that in every murder case or assault case, and would not permit that. But where a decedent makes some volitional act, like pulling the tube out of his mouth, I'm not quite sure that shouldn't come in. I don't know if the record here is sufficient, whether the defendants really made a proper proffer on that. But it may be that the language you read is sufficient for that. So I'm sort of wondering why the court shouldn't let that type of evidence in, and then let the jury decide under the quite rigorous standard that everyone agrees on. And I guess, Your Honor, it's going back to the position that the defendants took early on in their papers, as cited by Judge Phillips. They agreed with Judge Phillips in their papers that in order to be a defense to murder, it has to be the sole cause of death. In other words, they would have to have a witness say, the reason why he died is because he pulled his tube out, not because he was stabbed. But doesn't the question really go to foreseeability, and that distinguishes between a simple act of negligence and something like this, where the victim's hand may have been the cause of death? Isn't that a foreseeability question? It may be, Your Honor. It is a foreseeability question. But that's not how the defendant framed it, and that's not the reason why the defendants wanted to introduce the evidence. Again, they never came back and said, this is for, as a defense to murder, this is to cut off our liability for murder. They kept coming back and saying, this is to show the force, to show that we did not intend to kill him. So they argued that there was an intent to kill, shown in the force used in the stab wounds, but they didn't argue, as I understand it, that the victim's volitional act was a supervening cause that would avoid proximate cause. That's correct, Your Honor. That's correct. But what was the basis for that proffer then? What was the reason that the attorney would say, we would ask the coroner about the decedent pulling out the tube. What would that proffer be for if not to show that there was an intervening cause? Again, Your Honor, I think as they summarized it at the sidebar, it was to show the intent that they did not intend to kill, they did not intend to injure the victim with such a force or to stab the victim with such a force to kill him. Would it be fair to say that you're arguing the foreseeability is the cardiac arrest, regardless of how that arrest might have come about? Of course, Your Honor. I think any time you stab somebody, I mean, that was the position that we took, that these defendants, Jose Murillo stabbed this victim, he's punched his ear, pierced his lung, he's pierced his liver, and that was enough to show an intent to kill. You know, this was not a case, you know, like the main case, and that's a different case because in the main case, that's an involuntary manslaughter case. The jury doesn't have to find intent to kill, doesn't have to find the murder requisite. So in that case, as defense counsel pointed out, as the court pointed out, the defendant could have been liable for the involuntary manslaughter just because a bear had attacked the victim. But here, the jury was given instructions on the murder instructions, and they were told that they had to find malice at forethought. And that's why in this case, it's different than having involuntary manslaughter, where you don't have to find malice. Here, one of the elements is malice. And the other question, Your Honor, that was raised is with regard to the conspiracy, and that's something we addressed. Conspiracy doesn't require, it just requires an agreement and an overt act. Those are the elements as the instructions. And in this case, the jury found the defendants guilty of the conspiracy. I notice you only have maybe a minute and a half left. If I may, Your Honor, if I may. What about on the Brady issue? I'm sorry, the Brady issue, Your Honor. Let me be very clear, Your Honor. In this case, the jury was not left with the impression that there was no benefit to be given to Mr. Davis. Ryan Davis's own testimony is provided in our briefs. But was it misled in terms of when he possibly could get out? Your Honor, if I may. He's not present. No, let me just say that, Your Honor. And I do want to just briefly direct the Court. These were not included in any of the excerpts. But they're the closing arguments of both defense counsel. And this is for Mr. Morillo and Mr. Rodriguez. I'll just simply cite the Pacer documents, document 857, starting at page 62. What day of the trial transcript is that? Sorry, Your Honor, the date is not. Let me just. This is on July 17th. And what page would that be, Pacer page? Page 63, for example, 63. Okay. He got a promise, we'll take care of you, we'll make sure you're safe, and you might get an additional time cut. We're not going to make you any promise now. But that, for a guy like Ryan Davis, is as close as it's ever going to get. To a guarantee. So it was argued by counsel at closing. The jury heard that he got one-third reduction in his sentence from his prior cooperation with the government. In this case, this case was remanded back to Judge Phillips. The Court reviewed not just the documents, the briefs, but all internal documentation, emails, internal memoranda that was between the government and counsel for Mr. Ryan, between the government attorneys down in California and Oregon. And Judge Phillips made a finding. There was no secret agreement. Your Honor, I think I have 47 seconds. Well, actually, you're over 47 seconds. Oh, I'm sorry. So could you wrap up, please? Your Honor, may I finish just a couple of minutes? May I go over a few? Go ahead. Judge Robinson? Yes. Could we let the government have a couple of minutes to make sure they cover this important point on the Brady issue? Absolutely. And then give a couple of minutes extra, I'm going to follow up. All right. After the balance. Okay. Thank you, Your Honors. And the jury was told repeatedly to be skeptical of Ryan Davis, instructions 17 and 19. After he testified, Judge Phillips told them to be skeptical of him, that he may get a benefit as a result of his testimony, right after his testimony. At the end of the trial, the jury was reminded of that. But my question, were they misled by the government's rebuttal argument? Your Honor, let me just say, let me just read that part and just clarify that. Here's what was said in rebuttal. There was some suggestion yesterday that Davis is really trying to get a deal in this case. And he testified, ladies and gentlemen, that's not disputed, that his projected release date from prison is January 2011. But he also told you, and this was on cross-examination, quote, so in large measure, you owe the government your life, in your view. And I quote, that's the question, and then it's quoting what Davis said, I don't know if I owe my life, I probably owe my safety at this point. I have a great gratitude that they took the seriousness of the situation and realized what danger I was putting myself in by cooperating with them, and I'm very grateful. The defendants are never going to forget that I testified against them. Your Honor, I'm not talking about that portion. I'm talking about the portion where your opponent says that the government's in rebuttal, closing argument to the jury, gave a time, a year, when he's going to get released, and then a short time later, files a motion to get him out even earlier. And again, this is the part, Your Honor, that was quoted by defense counsel, talking about what Ryan Davis had said about January 2011. Your Honor, looking back at this, looking, certainly seeing the arguments that were made by the defense on appeal, and with the benefit of four or five years of experience under my belt, I wouldn't have made the argument the way I've said it. I certainly would have also referred to the cooperation agreement in this case, to the jury instructions that was given to the jury. It certainly wasn't as clear as I would have liked it to be, but certainly when we look at the totality of what the jury was told by Ryan Davis testifying that he wasn't expecting anything, but that's very common that people who cooperate get a reduction in his sentence. The jury instructions that were given by the court, and we cited, and again, it's in the sealed excerpts of records, Your Honor, where the government back then believed that Ryan Davis testified truthfully. The government today still believes that Ryan Davis testified truthfully. There was no wink and a nod. Repeatedly he was told that there's no promise, you know, you're going to, there was a written agreement entered into, discussed substantial assistance, discussed the importance of testifying truthfully. Repeatedly in the FBI 302s that are in the sealed excerpts, he was told that. Before the grand jury, when he testified, he was also told that, and that agreement, the entire agreement was put on the record. Counsel, when you were discussing the closing argument, were you talking about the government's closing argument or defense's closing argument? Were you talking about the promises as close as he gets? That was the defense's closing argument, Your Honor. The first part that I cited. Okay. All right. Any additional questions from the panel? All right. Thank you, Counsel. Okay. Four minutes for rebuttal. All right. Thank you. Thank you, Your Honors. I'm going to try to make up five points, if I may. One, I would ask the Court to please not refer to this as a medical negligence issue. It's the cause of death evidence, not medical negligence. And the reason it was framed that way is because the government below framed it that way when they made a preemptive motion to exclude it. And they said it was only evidence of medical negligence. But that's how it's framed in the brief, though. No, gross medical negligence and proximate cause is how it's framed in the briefs. And I might be wrong about that, but I think that's how it's framed. I'm looking at the issues presented on page four. Did the district court's exclusion of exculpatory medical evidence regarding proximate cause violate appellant's Fifth and Sixth Amendment rights to present a defense? Yes, and I was talking about that. Counsel, let's assume the panel, you know, is deciding that you are arguing exclusion of medical evidence, because without that, so what? You remove the breathing tube. That's some medical evidence to say that that contributed to his death, right? I'm just trying to frame the issue, Your Honor. All right. That was the first point I'm making. The second point I'd like to make is you'll notice in the government's answering brief they never address the breathing tube. I think in our opening brief we discuss it on more than half the pages. It's our main argument. They never mention it once in their brief. This morning, an oral argument before Your Honors, Mr. Raphael went about eight minutes into it before both Judge Rawlinson and Judge Gould pressed him. And, Judge Lamont, you pressed him on the issue. So is your argument that his pulling out of the medical tube was part of the medical negligence? Medical evidence. Cause of death evidence, yes. And that's the key. That's the main argument we make. I see a difference between medical negligence and intervening acts of the defendant. Okay. That's why I want you to not call it medical evidence. We called it exculpatory medical evidence, not medical negligence. Evidence, Your Honor. Issue four. Sorry, issue one. Issue number one. Did the district court's exclusion of exculpatory medical evidence regarding proximate cause violate appellant's Fifth and Sixth Amendment rights to present a defense? I thought it said medical negligence. Okay. And that's why I made it as my first point because it's medical evidence. The second point I'd like to make is at multiple times my colleagues said the only thing defendants said was about this one proffer. That they never came forward with a proffer. They never put forward their expert. And there's a problem with this. At least the government finally on prodding from the bench got to page 448, which is exactly a proffer. After the medical coroner testified and after they tried to establish through the medical coroner that the cause of death was brain death and that there was what the complications were, to explain sequelae because the medical coroner did not testify he died from stab wounds. He died from sequelae of stab wounds. And they want to know what that meant because it didn't mean he died from the stab wounds, which is why the coroner could not honestly testify to that. And then they said, well, fine, let me make a, here's what we would get through the medical testimony in this trial. While he was, in the course of his treatment, I'll just read the whole thing. There are complications that flowed from the stabbing of Mr. Scopazzi that I would elicit from the coroner. Mr. Scopazzi was first taken to Victor Valley Hospital. In the course of his treatment there, he was put on a breathing tube. While he was there, he pulled the breathing tube out and he also had a sudden loss of blood. The combination of pulling the breathing tube out and the sudden loss of blood caused a cardiac arrest. In other words, his heart stopped and it stopped for 12 minutes. He was resuscitated. He was then taken next day to Arrowhead Regional Hospital Medical Center and he had another cardiac arrest. That is, his heart stopped. He was resuscitated again. He had exploratory surgery with no repair done. And he also had a CT scan to determine brain function. The CT scan revealed that his brain had swelled because of the lack of oxygen to the brain as a result of having those two cardiac arrests. As a result of that, he didn't have any brain function. After a period of time, the doctors declared because he didn't have the brain function, they declared him dead and they took him off life support. All right, counsel. You've exceeded your time by two minutes, so could you sum up, please? I will. Let me be brief then. I think that is a proffer of they've asked the evidence to come in a district court excluded under a wrong theory of law. I think Judge Lamell makes the correct point that they opened the door because the sequelae of puncture wounds is misleading and they were entitled to explore what complications were. But here's the problem. If they opened the door, why then didn't the defense seek reconsideration of the judge's ruling at that point and seek to have this evidence brought in? The proffer we just made was right after they opened the door and they asked to do that and the judge rejected at that very moment, ER 448 to 452. It asked to read 19 to 22 of the ERs. All right. One, as Your Honor, Judge Rawlinson pointed out, they were in an impasse position because the judge ruled this was excludable from the jury. The evidence wasn't coming in. You can't fault them for not bringing Dr. Morgan in then. Five, the wounds were not fatal. The evidence is ER 15. The coroner said his wounds were healed at the time he pulled out the tube. Those wounds didn't cause the brain function. And fifth, to Judge Lamell's original point on the conspiracy issue, there was a Pinkerton instruction in this case. And the jury might well have found that there was a conspiracy to fight, but because his death was a natural and foreseeable result of those fighting, they were all responsible for the death, and that's why the reasonable foreseeability about the death under Maine and Brackett should have been permitted for this jury as a fact question. If it's a fact issue for the jury, they should have been allowed to present this evidence. All right. Thank you, counsel. Thank you, Your Honor. Two minutes for subsequent rebuttal. Let the record reflect Judge Lamell in questioning his plain devil's advocate, not necessarily the final determinant on what he feels on this. Just a response, Your Honor. Thank you. All right. Counsel, two minutes. I just wanted to wrap up by saying that in closing argument, the government told the jury essentially that Ryan Davis was not getting out early. The government said, quote, there was some suggestion yesterday that Davis is really trying to get a deal in this case, and he testified, ladies and gentlemen, that's not disputed, that his projected release date from prison is January 2011, and then the government goes into, you know, he's testifying out of fear for his life. I'm sorry? If that's all true at the time, what's wrong with that? But it is giving the jury the impression that this guy is not getting out early. If you were to come back and then say to the jury, but by the way, he'll be out of custody in a couple of weeks, the jury, I think, would be stunned. Certainly the defense attorneys would be. It is totally inconsistent. I just want to wrap up by saying, you know, Giglio came down in 1972, and since that time, prosecutors have tried to figure out ways to get around it, and this court has repeatedly shot that down. This is another example of winking and nodding, and it should not be allowed to go on. But, again, the government doesn't know that even if it intended on filing that motion immediately after this trial, that the court was going to grant it. The jury was still informed that, you know, this is a possibility. And so even if the government said, well, he won't get out of jail until 2011, but the jury already knows that if they file this motion for reduction that he could get out earlier, wouldn't that be a fair assumption from the director? Well, I think that what the prosecutor said in rebuttal argument is shouting down the defense argument that he's probably going to get out. The government is saying, hey, come on, that's not going to happen. We didn't promise this guy anything. So what's wrong with the government responding to that argument? Well, you know, if somebody could say that, well, I just, as soon as the verdict came in, God, you know, I never thought about that. Maybe I should do something nice for this guy. I mean, come on. I think that that's what I'm trying to say here. And it's just simply not an afterthought. It was everybody's intention all along, and the jury was deceived. I mean, the jury knows because the court instructs them that what you lawyers say is not evidence in the case, and the evidence shows that there was this possibility, regardless of what the lawyers might have felt. It may not be evidence, but the jury is simply believing what the prosecutor is saying, has to believe in the prosecutor's case, and the whole issue here is we may know how the game is played, but the jury doesn't know how the game is played. And I think that that's what's important. Thank you, counsel. Thank you. Thank you to all counsel. The case just argued is submitted for decision by the court. We are in recess until 9.30 a.m. tomorrow morning.
judges: Lemelle, Gould, Rawlinson